E-FILED
Wednesday, 25 November, 2020  09:43:03 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | |
|---|---|
| MARK L. WHITE, an individual, | ) Case No.: |
| | ) |
| Plaintiff, | ) Judge: |
| v. | ) |
| | ) Magistrate Judge: |
| HY-VEE, INC., an Iowa Corporation; TROY HOEGNER, an individual; JERAD WELTER, an individual; and TIM HOUSBY, an individual; | ) ) ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

### VERIFIED COMPLAINT

NOW COMES the Plaintiff, MARK L. WHITE, an individual, by and through his attorney, for his Verified Complaint against the Defendants, HY-VEE, INC., an Iowa Corporation; TROY HOEGNER, an individual; JERAD WELTER, an individual; and TIM HOUSBY, an individual; and in support thereof states and alleges as follows:

### NATURE OF THE ACTION

1.      This is a federal-question and diversity action involving statutory claims under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e), *et seq*.; the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.; and common law and statutory claims under Illinois law.  MARK L. WHITE was discharged from his position(s) as a part-time meat stock clerk at HY-VEE, INC. on or about November 15, 2019.  MARK L. WHITE was subjected to various retaliatory actions and ultimately discharged in retaliation for: (i) internally reporting racism and discrimination in the employment practices at HY-VEE, INC., and (ii) filing claims with the Equal Employment Opportunity Commission against HY-VEE, INC., in 2017 and 2019.

## PARTIES

2.      Plaintiff, MARK L. WHITE ("WHITE"), is an individual that has resided in Rock Island, Illinois, at all relevant times herein.

3.      Defendant, HY-VEE, INC. ("HY-VEE"), is an Iowa corporation with its principal place of business located at 5820 Westown Pkwy, West Des Moines, Iowa 50266. HY-VEE operates a chain of retail stores in eight states including a store located at 750 42nd Avenue Drive, Moline, Illinois 61265 (hereinafter referred to as the "Moline #2 Store"), which was where WHITE was employed at all relevant times herein.

4.      Defendant, TROY HOEGNER ("HOEGNER"), is an individual (White/Caucasian) (under 40 years of age), that upon information and belief, resides in Illinois. At all times relevant to this action, HOEGNER was and is employed by HY-VEE as the Human Resources ("HR") Manager for HY-VEE's Moline #2 Store from 2014 until the present day.

5.      Defendant, JARED WELTER ("WELTER"), is an individual, (White/Caucasian) (under 40 years of age) that upon information and belief, resides in Illinois. At all times relevant to this action, WELTER was and is employed by HY-VEE as the store manager for HY-VEE's Moline #2 Store from June 5, 2017 until the present day.

6.      Defendant, TIM HOUSBY ("HOUSBY"), is an individual (White/Caucasian) (under 40 years of age), that upon information and belief, resides in Illinois. At all times relevant to this action, HOUSBY was and is employed by HY-VEE as the manager of store operations for HY-VEE's Moline #2 Store from 2014 until the present day.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because

WHITE asserts claims that arise under the laws of the United States, namely, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e), *et seq*., and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.

8.     The Court has supplemental jurisdiction over WHITE'S state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to WHITE'S federal-question claims that they form part of the same case or controversy.

9.     The Court also has subject matter jurisdiction in this action pursuant to 28 U.S.C. §1332(a)(1) because WHITE and Defendants are citizens of different States and there is more than $75,000 in controversy.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events giving rise to WHITE'S claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

11.     WHITE began working for HY-VEE as a part-time courtesy clerk on or about May 16, 1988 at HV-VEE's Rock Island, Illinois store until October 19, 1989.

12.     On November 17, 2008, WHITE was rehired by HY-VEE to work as a part-time produce clerk at HY-VEE's Moline #2 Store, which was a brand-new store at the time of hire.

13.     Sometime in June 2009, WHITE was walking through the back of Moline #2 Store and noticed another Black/African American employee, LaShawn Bell, sitting facing a wall and picking beans as punishment.  As WHITE was talking to LaShawn Bell, Mike Simpson (White/Caucasian), the Produce Manager at the time, came from behind a large stack of pallets and started yelling at LaShawn Bell to get off the crate he was sitting on and begin cutting apples.

14.     When WHITE expressed his opinion of the situation and asked Mike Simpson if he could finish his conversation with LaShawn Bell, Mike Simpson began to yell at WHITE.

15.     Both Mike Simpson and WHITE were subsequently called into the office of Jennifer Neice, the HR manager at the time, whereby Jennifer Neice told both Mike Simpson and WHITE to either shake hands or she would write them both up.  Mike Simpson and WHITE subsequently shook hands and walked out of Jennifer Neice's office.

16.     Sometime in November 2009, WHITE called Jennifer Neice, HY-VEE's then HR manager, to complain about not getting enough hours or work.

17.     Subsequently, Jim Lehman (White/Caucasian), the store manager at the time, called WHITE on the phone and informed WHITE that he did not know what to do with WHITE, and suspended WHITE for two weeks without any write-ups, statements, or other documentation.

18.     Because of this, WHITE called the HY-VEE corporate office about getting suspended without any write-ups, statements, or other documentation.  The corporate official told WHITE that: (i) it was uncommon for employees to be suspended for two weeks, and (ii) that if an employee was suspended at HY-VEE, write-ups signed off on by the HR manager and store manager were needed, as were detailed statements from all parties involved that were signed an dated, and the suspension notice would have to be signed by the employee in acknowledgement.

19.     During this conversation, the corporate official also told WHITE that if what WHITE was saying was true, WHITE would get a call back from the store manager, Jim Lehman, and be told that WHITE would be returning to work the following Monday.

20.     Within a few hours, Jim Lehman called WHITE and asked if WHITE called corporate on him.  WHITE informed Jim Lehman that he did.  Jim Lehman told WHITE to come back to Moline #2 store the following Monday.

21.     Subsequently, when WHITE returned to the store on the following Monday, he learned he had been demoted by Jim Lehman from part-time produce clerk to part-time courtesy

clerk in retaliation for calling corporate on Jim Lehman. *See* Lehman's November 2009 Transfer Note, marked as Exhibit 1, attached hereto and made a part hereof.

22.  WHITE worked as a part-time courtesy clerk from June 2009 until March 2015, and during that time did not receive any training by HY-VEE, and upon information and belief, did not receive any formal reviews or evaluations by management. As a courtesy clerk, WHITE collecting carts and bagging groceries in the front of the store.

23.  In March 2015, WHITE was transferred to the meat department to work as a part-time meat stock clerk.

24.  Within two weeks of moving into the meat department, James Barton, a full-time meat stock clerk, transferred from the Moline #2 Store to HY-VEE's Moline #1 Store, leaving WHITE as the primary clerk for the meat department.

25.  Between March 2015 and July 2015, WHITE was effectively acting as the full-time meat stock clerk despite being paid as a part-time meat stock clerk.  As a meat stock clerk, WHITE was primarily tasked with: (i) unloading delivery trucks and stocking shelves, (ii) running back stop on delivery days, (iii) organizing and cleaning the meat cooler, and (iv) scanning out damaged and expired products.

26.  In July 2015, WHITE was informed that Moline #2 Store would have to cut thirty (30) hours from the meat department.

27.  In July 2015, HY-VEE asked Chris Stout (White/Caucasian), then employed as a parking lot manager, to take over the full-time meat stock clerk position, despite Chris Stout having no experience in the meat department.  Previously, Chris Stout was a manager in the garden center.

28.  In response to HY-VEE cutting 30 hours from WHITE's schedule, yet hiring Chris Stout to a meat stock clerk position that WHITE was already performing, yet not giving WHITE

the opportunity to interview for the position, WHITE approached HOEGNER to ask what happened. In response, HOEGNER told WHITE that he would give WHITE a $0.60 raise per hour.

29.    In late July or early August of 2015, HY-VEE transferred WHITE from his part-time meat stock clerk position back to the front of the store as a part-time courtesy clerk, where WHITE stayed until March 2016.

30.    On March 21, 2016, HOEGNER sent an email to every employee at HY-VEE's Moline #2 Store stating that it was "store policy that no employee shall discuss his or her wage with another employee," and if any employee was "caught discussing hourly rates, he or she will be disciplined according to store policy. (This is the warning, so it will go straight to a write-up.)"

31.    In March 2016, HOUSBY approached WHITE to inform him that due to Chris Stout needing knee surgery, HY-VEE wanted to see if WHITE could fill in for Chris Stout back until Chris Stout was able to return, working twenty-eight (28) hours—Monday, Wednesday, Friday, Saturday— in the meat department.

32.    WHITE declined the offer because he felt the job was not really an opportunity for promotion; but rather, WHITE felt he would only be a temporary fill-in until Chris Stout was able to return. Further, WHITE informed HOUSBY that he was unable to work Saturdays because he was taking care of his sick mother and was only able to have a caretaker look after his mother Monday through Friday.

33.    However, despite turning down the temporary part-time meat stock clerk position, one week later, WHITE noticed he was put on the schedule for the meat department working twenty-eight (28) hours—Monday, Wednesday, Friday, Saturday.

34.    On July 8, 2016, WHITE noticed that the meat department was delivered products for the deli department and that some of the boxes had been sitting there for a while. Because of this, WHITE approached Diane Farrell (White/Caucasian), a deli manager at Moline #2 store, to tell her that she had "stuff that's been down there for a couple of hours."

35.    In response, Diane Farrell began to scream at WHITE about the boxes.

36.    In response thereto, WHITE threw down his badge on the ground and asked Diane Farrell, "I've been here [in Moline #2 Store] for a few years, why would you talk to me like that?"

37.    In response thereto, upon information and belief, Diane Farrell left to go report WHITE to management.

38.    In relation to the incident, Diane Farrell never made any statements in writing nor never asked WHITE to go to management at the time.

39.    Greg Baker (White/Caucasian), the manager in the meat department at the time, told WHITE that Greg Baker did not have time to talk to Diane Farrell about the incident.  In response thereto, WHITE asked Greg Baker if he could go home right after the incident, and Greg Baker said that WHITE could leave.

40.    As WHITE began to make his way to the front of the store to leave, Greg Baker came out and yelled to WHITE, in front of customers, "You're done in my department!"

41.    In response, WHITE came back to the meat department and told Greg Baker, "You never gave me a chance. You were never on my side."  In response thereto, Greg Baker told WHITE, "It doesn't matter anyway, Chris Stout is coming back after medical leave."  Greg Baker then told WHITE to speak with HOEGNER on July 11, 2016 about the incident.

42.    On July 11, 2016, WHITE returned to Moline #2 Store at approximately 7:30 AM, and went to HOEGNER's office.  HOEGNER and John Weaver (White/Caucasian), the Store

7

Manager of the Moline #2 Store at the time, had been on vacation the week before and did not have a chance to begin an investigation into the incident with Diane Farrell.  Further, HOEGNER did not find any write-ups of WHITE from Greg Baker or Diane Farrell on his desk at the time.

43.    During this meeting, John Weaver asked WHITE to tell him what happened so he could put WHITE's statements in his report.  WHITE told his side of the story and then was sent home but was told he was not allowed to discuss anything with Diane Farrell or any other witness.

44.    On July 12, 2016, WHITE was not scheduled to work, but HOEGNER and John Weaver called WHITE to say they wanted to talk with WHITE about a write-up. During this discussion, HOEGNER told WHITE, "we're not firing you."

45.    During this discussion, HOEGNER also informed WHITE that video footage of the incident, while not containing audio of the incident, showed WHITE and Diane Farrell speaking to each other.  The video footage also allegedly showed a customer standing nearby turning their head really fast to see the conversation take place.

46.    HOEGNER told WHITE that after talking with Greg Baker and Diane Farrell, plus reviewing video footage of the incident in question and seeing a customer turn their head really fast towards the conversation, HOEGNER was taking Diane Farrell's side of the story.

47.    After informing WHITE of this, HOEGNER handed WHITE only a consultation form that indicated WHITE was being suspended for one (1) week.  *See* July 2016 Consultation Form, marked as Exhibit A, attached hereto and made a part hereof.

48.    Following this incident, WHITE was once again demoted from part-time meat stock clerk to part-time courtesy clerk, despite receiving any formal write-up.

49.    Shortly after this suspension, WHITE sent a letter to Carrie Irons, HR Director at HY-VEE, but never received a response.

50.     On December 22, 2016, while working in the front of the store as a part-time courtesy clerk, WHITE was approached by Mary Klouser, a front end manager for HY-VEE at the time, who asked if WHITE could wash dishes in the kitchen for her.

51.     As the only Black/African American courtesy clerk working in the front of the store, WHITE felt as though he was being singled out and asked to wash dishes, despite the fact that washing dishes was not in WHITE's job duties as a part-time courtesy clerk. Furthermore, WHITE was very busy upfront bagging groceries due to the Christmas-time rush. Additionally, WHITE knew that Diane Farrell was in the kitchen that day and based on his interaction with Diane Farrell back in July 2016, which resulted in WHITE's suspension, WHITE was apprehensive about working near Diane Farrell. Shortly after the July 2016 incident, WHITE was also told by HOEGNER, "any other outbursts with Diane Farrell and you'll be let go."

52.     As such, WHITE indicated that he was too busy and could not step away to wash dishes for Mary Klouser. In response thereto, either HOUSBY or Mary Klouser told WHITE: "you either do as you're told, or you go home." In response thereto, WHITE informed both HOUSBY and Mary Klouser that he would take the option to go home, and he left the store.

53.     On December 28, 2016, WHITE was called to a meeting with HOUSBY and HOEGNER to discuss the dishwashing incident involving Mary Klouser. During this meeting, WHITE was written up for insubordination. *See* December 2016 Write-Up, marked as Exhibit B, attached hereto and made a part hereof.

54.     During this meeting, WHITE asked why he was always passed over for promotions and indicated that he simply wanted a full-time job. HOEGNER indicated that a full-time meat stock clerk position was coincidentally publicly posted that day on December 28, 2016. However, HOEGNER also indicated that if WHITE was to apply for the position, he "most likely would not

get it because of his recent job performance."  *See* HOEGNER statement, marked as Exhibit C, attached hereto and made a part hereof.

55.    On December 30, 2016, Carrie Irons, HY-VEE's HR Director, issued a statement on the write-up indicating that "if [WHITE] felt uncomfortable working in the dish room because of the incident with Diane then he should not have been treat[ed] that way by [HOUSBY]." *See* Irons December 2016 Statement, marked as Exhibit D, attached hereto and made a part hereof.

56.    On December 31, 2016, WHITE called Carrie Irons to discuss his recent write-ups. During this conversation, Carrie Irons told WHITE that HY-VEE does not have a policy that mandates courtesy clerks have to do as they are told or risk discipline, and that managers cannot force or make a courtesy clerk do work in a department or area of the store that they do not work in; however, the employee may be asked if they would *like* to volunteer to perform the work as a courtesy, which the employee can either accept or turn down.

57.    During this conversation, Carrie Irons also told WHITE that it was HY-VEE's corporate policy that a part-time courtesy clerk positions were not a path to promotional opportunities, and that any hours provided to part-time courtesy clerks would always be based on store needs.  In this conversation, Carrie Irons also told WHITE that the only way to be considered for a promotional opportunity would come from WHITE working in a department such as produce, meat, seafood, etc., which offers promotions from part-time to full-time, assistant manager, manager, etc.

58.    During this conversation, Carrie Irons also told WHITE that he should request his personnel file from HOEGNER.

59.    On January 3, 2017, WHITE applied for a full-time Meat Stock Clerk position at HV-VEE's Moline #2 store; but WHITE was never given an interview for the position.

60.    In January 2017, WHITE requested his personnel file from HY-VEE pursuant to the Illinois Personnel Record Review Act, 820 ILCS 40/ *et seq.*

61.    In February 2017, WHITE filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") as EEOC Charge Number: 26J-2017-00038, for discrimination by HY-VEE management. *See* WHITE 2017 EEOC Charge, marked as Exhibit E, attached hereto and made a part hereof.

62.    Upon information and belief, sometime in March of 2017, after WHITE filed his 2017 EEOC Charge, HOEGNER was audited by HY-VEE regarding WHITE's claims of discrimination.

63.    Also, during the same time period, and after WHITE filed his 2017 EEOC Charge, HY-VEE coincidentally announced it was holding open interviews to hire people of all ethnic backgrounds for the Moline #2 Store.

64.    Sometime in March 2017, in response to the audit, HOEGNER asked WHITE to sign a policy form dated March 2013.  The policy form stated that the HY-VEE store must post a position for seven (7) days in store before it is posted on the website. WHITE was uncomfortable with signing a form dated from 2013 at the time and did not agree to sign the policy form that day.

65.    During this meeting, WHITE asked HOEGNER about HY-VEE's recent advertisement about open-interviews jobs at the Moline #2 Store and expressed his interest in applying for one of these open-interview jobs.  In response thereto, HOEGNER brushed WHITE off and informed WHITE that he would need to set up an interview.

66.    On or about March 17, 2017, HY-VEE hired two Black/African American employees in the meat department, Marcus Hampton and Jamie Wilson.

67.     Sometime in May 2017, Mary Klouser asked WHITE to sign the policy form again, so WHITE signed the policy form dated March 2013.

68.     On or about May 19, 2017, WHITE applied for the position of full-time Meat Wrap Coordinator at HY-VEE's Moline #2 Store on the company website and received and email confirmation of his application.

69.     On May 24, 2017, the EEOC closed WHITE's file and issued a right to sue letter. *See* 2017 EEOC Right to Sue Letter, marked as   F, attached hereto and made a part hereof.

70.     In early June 2017, HOEGNER finally sent WHITE's personnel file to WHITE despite WHITE requesting the personnel file in January 2017.

71.     In June 2017, HOEGNER approached WHITE and informed WHITE that he removed a document from WHITE's employee file during the EEOC investigation.

72.     After being given the Right to Sue letter from the EEOC, WHITE began to look for attorneys to help him bring his civil suit against HY-VEE but was unable to find an attorney at the time.

73.     On or about June 27, 2017, WHITE applied for a part-time Service Meat Clerk position, but was never offered an interview for the position.

74.     On or about July 17, 2017, HOEGNER cut WHITE's hours from twenty-four (24) hours a week to six (6) hours a week.

75.     Due to his hours being cut, WHITE approached WELTER, the Manager of Moline #2 Store, and Patricia Proctor (White/Caucasian)(under 40 years old), General Manager of Perishables, about getting more hours.  Both WELTER and Patricia Proctor said they would help WHITE get more hours; however, WHITE did not get more hours.

76.     On July 25, 2020, because WHITE felt as though HOEGNER cut WHITE's hours in retaliation for filing an EEOC complaint, WHITE contacted the Rock Island Human Rights Commission (the "RIHRC") to help assist WHITE.  *See* RIHRC Letters, marked as Group Exhibit G, attached hereto and made a part hereof.

77.     Through the RIHRC, WHITE had mediation discussions with HY-VEE management in November 2017.  *See* Group Exhibit G.

78.     Sometime between March and April 2018, WHITE was transferred to the frozen foods department as a part-time frozen food clerk.

79.     On or about August 17, 2018, WHITE was transferred from part-time frozen food clerk back to the meat department as a part-time meat stock clerk loading and unloading trucks. WHITE's hours were Monday, Wednesday, and Friday from 7:00 AM to 3:00 PM.

80.     On September 28, 2018, WHITE applied for a position as a full-time meat stock clerk on the company website and received and email confirmation of his application.  The position closed on October 4, 2018, but the position was then extended to October 14, 2018.

81.     On October 19, 2018, WHITE was denied an interview for the full-time meat stock clerk position by WELTER.  WELTER told WHITE that WHITE did not have the proper training for the full-time position, but that if WHITE was given six (6) months of order training, he may be eligible in the future for the position. Further during this conversation, WELTER told WHITE that there were not enough applicants for the position.

82.     Subsequently, WHITE learned that WELTER had offered the full-time meat stock clerk position to Colt Smith (White/Caucasian)(under 40 years of age) at the Moline #2 Store, but Colt Smith turned the job down, as he felt it was a demotion.  Colt Smith was previously the dairy manager for Moline #2 Store.

83.     By late November 2018, WHITE had still not received any order training since the denial of an interview on October 19, 2018.  The Manager of the Meat Department at the time, Eddie Cupp, advised WHITE that it would be "too hard" to do order training during the holiday season.  Instead, Eddie Cupp told WHITE he could do cycle count[1] training. WHITE felt as though cycle count training was something a manager needed, not a part-time clerk; but was excited to get a chance to prove himself.

84.     Subsequently, WHITE attempted to get cycle count training with Ahren Swan, the Assistant Manager of the Meat Department at the time, but Ahren Swan only gave WHITE a five (5) minute tutorial.  Because of this, WHITE approached Tiffany Butler, Manager of Retail Product Management ("RPM"), in late November 2018, for cycle count training.

85.     After receiving his cycle count training, Eddie Cupp and Ahren Swan told WHITE he had to do cycle count work in the meat department.  Doing so caused WHITE to have to perform more work for no extra pay.

86.     On November 27, 2018, WHITE observed Eddie Cupp and WELTER give an interview to Jasmine Jack (race unknown)(under 40 years of age) for a full-time position in the meat department.  Jasmine Jack did not apply for the full-time position and the position was not posted to give all employees an opportunity to apply.

87.     On Friday, December 7, 2018, WHITE left work at 3:00 PM and noticed he was not on the schedule for the following week.  WHITE did not have a write-up or consultation for

---

[1] Cycle counting is counting the entire inventory at the grocery store. The following are specifics on the job duties of cycle counting: When an employee who is trained to cycle count (managers of departments), they must get assigned numbers to use the RPM gun.  The employee must also sign a sheet that asks for the time of use of the RPM gun, the number of the gun and the department where the employee is using it.  When cycle counting, the employee must also verify the count with the RPM Manager, Tiffany Butler.  Tiffany Butler confirms the count, managers agree with the count, and Tiffany Butler then takes the count to the store director, WELTER.  After confirmation from the store director, the final results are then sent to the corporate office in Des Moines, Iowa.

any issue in the meat department that would have caused him to be removed from the schedule, not did WHITE ask to not be on the schedule.

88.     On Monday, December 10, 2018, WHITE went to the store to discover why he was off the schedule.  When WHITE arrived, HOEGNER asked WHITE to go to the HR office.

89.     During this meeting, WHITE was told that WELTER, HOEGNER, Patricia Proctor and Eddie Cupp, discussed removing WHITE out of the meat department and back into the front of the store as a courtesy clerk, with no write-up or consultation, based upon Eddie Cupp alleging that WHITE was not happy working in the meat department.  WHITE asked that Eddie Cupp be brought into the meeting, but WHITE's request was denied.  During this meeting, WHITE tried to raise his concerns with HOEGNER about the decision, but HOEGNER stated that the decision had already been made.  When WHITE tried to ask further questions, HOEGNER stated to WHITE, "You have no right to ask us questions."

90.     Thereafter, WHITE left voice messages with Lainie Cooney, Southern Region Director, Human Resources at HY-VEE, on December 10th, 11th, 12th, and 13th of 2018.

91.     On December 14, 2018, WHITE approached WELTER and requested a meeting with him, HOEGNER, Patricia Proctor, and Eddie Cupp, regarding the discussions they all had on or about December 10, 2018, which resulted in the decision to remove WHITE from the meat department. After some resistance, WELTER agreed to have a meeting on December 19, 2018.

92.     On December 14, 2018, Lainie Cooney called WHITE about his issues at the store. WHITE told Lainie Cooney that he spoke to WELTER and set a meeting for December 19, 2018. Lainie Cooney stated that she would arrange for Carrie Irons, a Human Resources Manager for HY-VEE, to observe the meeting in person or by a conference call.

93.    On December 19, 2018 - The meeting was held in WELTER's office with Eddie Cupp, Ahren Swan, and WHITE.  HOEGNER was not present for the meeting.  After both sides stated their positions, Carrie Irons stated that "Moline Store #2 rushed to judgment" by removing WHITE from the meat department on December 10, 2018.  WHITE was then allowed to go back to work in the meat department.  However, no training was subsequently offered to WHITE.

94.    By December 31, 2018, WHITE was back at work in the meat department, working as a part-time stock clerk on Monday, Wednesday, and Friday from 7:00 AM to 3:00 PM.  WHITE discovered that on the day he was taken out of the meat department, Dylan Michael (White/Caucasian)(under 40 years of age) was hired to do ends in the meat department with WHITE.

95.    During WHITE's investigation into the hiring, WHITE discovered that: (i) Dylan Michael's aunt was also a store director at another HY-VEE store; (ii) Dylan Michaels had previously been fired (and subsequently re-hired) on multiple occasions at HY-VEE's Davenport #5 store, despite threatening an employee, having a bad temper, and frequently calling off work.

96.    On January 11, 2019, WHITE had a conversation with Eddie Cupp about once again getting order training in an effort to pursue the full-time meat stock position.  Eddie Cupp did not give WHITE order training.

97.    In February 2019, Darcy Lindsey (White/Caucasian) was promoted to Manager of the Seafood Department, after previously working in the Salad Bar.  Darcy had no training to be a Seafood Manager at the time.

98.    On February 22, 2019, Dylan Michaels was taken out of the meat department, and WELTER told WHITE he was bringing Julia Lovette (White/Caucasian) into the meat department to allegedly assist WHITE, with her first day to begin on February 25, 2019.

99.     On March 6, 2019, WHITE worked unloading delivery trucks alone despite having a high volume to unload.  WELTER had Julia Lovette work in the kitchen outside the meat department instead of having someone else cover the kitchen manager shift.

100.    Furthermore, during this relevant time period, WHITE was frequently forced to unload trucks and do ends alone despite Dylan Michaels and Julia Lovette supposedly being brought in to assist WHITE, while Dylan Michaels and Julia Lovette were both used to help in other departments based on direct orders from WELTER.

101.    On March 13, 2019, WHITE applied for a full-time meat service clerk position in the Moline #2 Store.

102.    On March 16, 2019, the full-time meat service clerk position closed. After the position closed, WHITE was not offered an interview.

103.    On March 25, 2019, Cameron Gasper (White/Caucasian)(under 40 years of age) was given the full-time meat service clerk position.

104.    However, by late March 2019, WHITE had completed truck training; food handling training, cycle count training; learned to make shelf tags; as well as learned how to scan out damaged products in his attempts to take the initiative and the necessary steps to get a full-time position with HY-VEE.  At that point, WHITE had been employed for almost ten and half (10 ½) years with HY-VEE, had great attendance despite having to catch a bus to work every day, and still had never been interviewed for a full-time job after applying on several occasions.

105.    On April 29, 2019, Julia Lovette was transferred to the Asian Department, leaving no other employees to help WHITE in the meat department ends position.  Ahren Swan told WHITE that he did not agree with WELTER's decision to move Julia Lovette from meat ends.

106.    At the time, Ahren Swan stated that ends in the Meat Department were making $40,000.00 in sales per month, and the Asian Department was producing much less revenue.  At the time, grilling season was fast approaching and the truck loads were getting much bigger, and more help (not less help) would be required.

107.    On or about May 2, 2019, WHITE left a note for WELTER to discuss this situation in meat ends.  WELTER told WHITE he would set up a meeting for May 6, 2019, which was later rescheduled to May 8, 2019.

108.    On May 8, 2019, WELTER met WHITE on the sales floor in the meat ends department.  WHITE asked if they could meet in WELTER's office, but WELTER refused. During this meeting, WELTER informed WHITE that the reason WELTER did not promote WHITE to the full-time meat service clerk position given to Cameron Gasper on March 25, 2019, was because WELTER allegedly heard WHITE state in the breakroom to other employers that WHITE "wasn't being treated fair." However, there was no documentation signed by any witnesses to support WELTER's statement.

109.    That same day, WELTER stated that he would get contact Tiffany Butler about training WHITE to order on meat ends.  WHITE was confused as to why his own meat department managers could not train him on ordering products.

110.    On May 10, 2019, WHITE learned that Tami Bush (White/Caucasian) was promoted to Dairy Manager.  However, Tami Bush did not apply for the position on the HY-VEE company website; but was simply given an interview by WELTER and promoted the same day.

111.    On May 25, 2019, WHITE sent a letter to Lainie Cooney, Southern Region Director, Human Resources at HY-VEE, about his disappointment and dissatisfaction about lack

of training and promotion opportunities to full-time employment.  *See* Letter from WHITE to Lainie Cooney, marked as Exhibit H, attached hereto and made a part hereof.

112.   On June 3, 2019, HOEGNER approached WHITE on the sales floor and informed WHITE that he put WHITE in for a raise to WELTER.  The raise was for $0.35 and appeared on his WHITE's next check.  However, the timing was suspect as no evaluation/review was given prior to the raise, and it was randomly given after WHITE contacted Lainie Cooney.

113.   On June 4, 2019, WHITE once again sent a letter to Lainie Cooney, expressing his frustration with how he was being treated by Moline #2 Store management and how he had been passed up for promotional opportunities despite his years of service and good work ethic.  *See* WHITE letter to Lainie Cooney, marked as Exhibit I, attached hereto and made a part hereof.

114.   On June 5, 2019, WHITE found out that Lori Bote (White/Caucasian), who had not worked at HY-VEE, was hired off the street and made the Health Market Manager, despite the position not being advertised internally.  Once again, WHITE felt it was unfair that he, having almost eleven (11) years of service at the time, could not get an interview for any position he applied for, yet White/Caucasian people were being given jobs at the Moline #2 Store without having to sit for interviews.

115.   Around this same time, Darren Zink (White/Caucasian), a fellow employee at the Moline #2 Store, told WHITE that he had a conversation with WELTER in which WELTER was talking poorly of WHITE behind his back.

116.   On June 7, 2019, WHITE's paycheck showed a $0.35 raise.  At that point, WHITE's pay increased from $11.80 per hour to $12.15 per hour.  It had taken WHITE over ten (10) years to make $12 per hour, yet in some cases, White/Caucasian employees and employees

younger than 40 years of age had their wages increased to over $12 per hour within only a few months of working at HY-VEE[2].

117.    On June 13, 2019, WHITE and Ahren Swan had a conversation in the meat cooler whereby Ahren Swan asked WHITE to perform a cycle count.  WHITE indicated that he had not yet had adequate cycle count training and expressed that he would be uncomfortable and unable to perform a cycle count at the time, and that he further believed the task was generally given to managers of each department, not part-time stock clerks.

118.    On June 14, 2019 , WHITE was called into HOEGNER'S office sometime after 11:00 AM.  During this meeting, WHITE was informed he was being written up for not cycle counting.  During the meeting, WHITE stated that he believed the task was generally given to managers of each department, and that it was not fair that he was still getting paid as a part-time clerk if he was being required to perform the work of a manager.  Accordingly, WHITE asked HOEGNER to see the job responsibilities for part-time stock clerks in the meat department.

119.    During this meeting, and previously before, WHITE told HOEGNER and WELTER that he would like to do his job as a part-time stock clerk and that he was willing to be trained for cycle counting or other tasks if he was offered a full-time position.

120.    During this meeting, WHITE noticed that the write-up was not written up by Ahren Swan or signed by Ahren Swan, despite Ahren Swan being the assistant manager who assigned the cycle counting task to WHITE. At the time, upon information and belief, Ahren Swan did not

---

[2] On March 21, 2016, HOEGNER sent an email to every employee at HY-VEE's Moline #2 Store stating that it was "store policy that no employee shall discuss his or her wage with another employee," and if any employee was "caught discussing hourly rates, he or she will be disciplined according to store policy. (This is the warning, so it will go straight to a write-up.)" *See* Email from Hoegner to all employees, marked as Exhibit J, attached hereto and made a part hereof.

agree with the write-up, as well.  Therefore, WHITE did not sign the write up.  WHITE Also asked for a copy of the writeup, which HOEGNER also did not sign.

121.    On June 26, 2019, WHITE was given a review by HOEGNER after the $0.35 raise was given to him.  HOEGNER and Seth Decker did the review.  WHITE was frustrated because he did not work directly with either of these men, and no employees from the meat department represented WHITE in his review.

122.    On or about June 27, 2019, WHITE sent another letter to Lainie Cooney expressing his frustrations with the way he was being treated by HY-VEE management.

123.    On July 18, 2019, WHITE received a call at 9:12 AM from Carrie Irons regarding his letter to Lainie Cooney.  During this conversation, WHITE expressed his frustrations with the way he was being treated by WELTER and HOEGNER.

124.    On July 18, 2019, Eddie Cupp began scheduling WHITE a half hour less on Thursdays.  WHITE felt at the time that this was in retaliation for writing his letter to Lainie Cooney.

125.    On July 26, 2019, HY-VEE changed its sales tags companywide.  This task was primarily given to managers of the departments, but WHITE took the initiative and finished the task for the meat department to show he was a team player and to prove he was worthy of a full-time opportunity from HY-VEE.

126.    During this period, WHITE was still performing his job of unloading trucks and doing ends without any help.

127.    By August 5, 2019, WHITE noticed that unloading trucks continued to be exceedingly difficult for him to do alone, with generally 400-600 pieces to unload, generally on Mondays, Wednesdays and Fridays.  During this time, Kathy Aguilera (race unknown), a part-

time employee, was brought into the meat department to help with the service counter.  On days that WHITE did not work where there were truck deliveries, Eddie Cupp and WELTER would assign employees to assist White/Caucasian meat department employees unload trucks, but would not do the same for WHITE on days he was working.

128.    On August 7, 2019, Hannah Lipinski (White/Caucasian) was re-hired by WELTER or HOEGNER after quitting her job at the Moline #2 Store over two (2) years prior.  Hannah Lipinski was permitted to pick up her full-time position where she left off at the store.

129.    On August 19, 2019, while WHITE was on break, WELTER interrupted his conversation with two (2) White/Caucasian employees and asked WHITE what he was talking about.  WHITE felt as if WELTER would harass him throughout the store when he was talking to White/Caucasian employees.  During this conversation, WELTER told WHITE he would get him some help for trucks on Mondays, Wednesdays and Fridays at night but would not help WHITE close his shift, which ended at 3:00 PM.  WHITE  felt as if WELTER was going out of his way to treat him unfairly.

130.    On or about August 19, 2019, WHITE gave HOEGNER two (2) letters requesting HOEGNER's copies of two writeups from June 2019.

131.    On or about August 26, 2019, WHITE received the documentation he requested from HOEGNER; however, WHITE noticed that the documents were now signed after the meeting (having not previously been signed by HOEGNER).  WHITE felt that the documents were altered.  WHITE also noticed that HOEGNER was not speaking to WHITE after he asked for the documents.

132.    On September 9, 2019, WHITE had a large truck delivery of load of approximately 600 pieces to unload.  WHITE requested help from WELTER, and WELTER indicated he would

help WHITE arrange for additional help.  However, that day, WELTER did not help WHITE or get additional help; instead, WELTER helped a White/Caucasian employee under 40 years of age, Ethan (last name unknown), in the frozen section.

133.    Later that same day, September 9, 2019, Ahren Swan, told WELTER and Seth Decker, the assistant manager of store operations (White/Causasian)(under 40 years old), that they should see how WHITE worked without any help unloading the trucks and how the meat department could use additional part-time help to assist WHITE.  Seth Decker stated that "corporate has to be involved in order to make those decisions."

134.    That same day, September 9, 2019, Ahren Swan also complimented WHITE saying that ends were up $4,000 in profit due to WHITE's work.

135.    On or about September 29, 2019, HOEGNER put a sign up in the breakroom of Moline #2 Store stating that if employees do not sign new policies by October 1, 2019, they would not be able to work.

136.    In early October of 2019, Eddie Cupp left Moline #2 Store, and Ahren Swan was promoted to manager of the meat department on or about October 14, 2019, which opened up the position for assistant manager of the meat department at HY-VEE's Moline #2 Store.

137.    On or about October 21, 2019, WHITE applied for the full-time meat cutting specialist at HV-VEE's Moline #2 Store.  *See* Email Confirmation, marked as Exhibit K, attached hereto and made a part hereof.

138.    On October 28, 2019, the full-time meat cutting specialist position closed; however, WHITE was never given an interview for the position. Further, Marcus Hampton, another Black/African American employee in the meat department, applied for the meat cutting specialist position and was also not offered an interview for the position, either.

139.    On or about October 29, 2019, WHITE filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") as EEOC Claim Number: 440-2019-07862 for once again getting passed over for promotion opportunities by HY-VEE and not being given the chance to interview for positions.  *See* WHITE 2019 EEOC Charge, marked as Exhibit L, attached hereto and made a part hereof.

140.    On or about November 4, 2019, Darren Zink (White/Caucasian), was given a position within the meat department as a full-time meat stock clerk, as well as given a $1 raise to take the position.  Darren Zink had no training in the meat department and had previously worked in the produce department.

141.    The position Darren Zink filled was neither advertised on HY-VEE's website, nor in-store, and WHITE did not get an opportunity to apply for the full-time position before it was offered to Darren Zink.

142.    On November 4, 2019, a new employee named Kevan (last name unknown) also began working in the meat department full-time.  Kevan did not previously work for HY-VEE, though, upon information and belief, Kevan had some culinary school training.

143.    However, the position Kevan filled was neither advertised on HY-VEE's website, nor in-store, and WHITE did not get an opportunity to apply for the full-time position before it was offered to Kevan.

144.    Both Darren Zink and Kevan were given training in the meat department, despite HY-VEE management telling WHITE that no one had time to further train WHITE at the time.

145.    On November 6, 2019, Ahren Swan informed WHITE that WELTER was planning on giving ends duties (which was part of WHITE's job) to Darren Zink.

146.    Upon information and belief, HY-VEE was notified on November 7, 2019 of WHITE's EEOC filing.

147.    On November 8, 2019, WHITE received an email from HY-VEE confirming he applied for the full-time meat cutting specialist at HV-VEE's Moline #2 Store, in which the email informed WHITE that due to the high-volume of applicants to the position, his application would be kept on file for ninety (90) days.  WHITE had never previously received an email notification like this for any position he had ever applied for prior to this opportunity.  *See* Email Confirmation, marked as Exhibit M, attached hereto and made a part hereof.

148.    On November 11, 2019, HY-VEE hired Mario Azipe (upon information and belief, Hispanic/Latino) to fill the full-time meat cutting specialist position that WHITE and Marcus Hampton were never considered for, despite WHITE and Marcus Hampton working in the meat department.  Mario Azipe had previously worked in the meat department for Moline #2 Store in 2018, but had left to work as the seafood manager in HY-VEE's Rock Island store.

149.    On November 13, 2019, at approximately 10:00 AM, two Moline #2 store employees, Dale Manley (White/Caucasian)(under 40 years old) and Dylan Michael (White/Caucasian)(under 40 years old) got into an argument on the sales floor, whereby a customer observed Dylan Michael tell Dale Manley: "If you don't stop talking to me, I'll break your fucking nose," whereby Dale yelled back: "No the fuck you won't!" The customer reported this alleged incident to Blaker Puff (White/Caucasian), the Checkout Manager.

150.    No immediate action was taken by Blaker Puff or any HY-VEE management.

151.    Subsequently, Dale Manley went to WHITE and began to tell him about his incident with Dylan Michael, but WHITE told Dale Manley: "You should report this to management.  Don't bring me into this."  After that, WHITE walked away and went back to work.

152.     Later, at approximately 10:30 AM on November 13, 2020, WHITE approached Tiffany Butler in a back room, the RPM Manager who was also Dylan Michael's cousin, to talk to her about a markdown on chili meat.  During this conversation, WHITE also asked Tiffany Butler if she could tell her cousin Dylan to "calm down."

153.     During WHITE's conversation with Tiffany Butler, Dylan Michael bust through the doors and began repeatedly yelling at WHITE to "keep my name out of your mouth!"

154.     In response, WHITE told Dylan Michael: "I'm a grown man, I have a son your age. You don't want this." As the two continued speaking, WHITE noticed Patricia Proctor, a manager, in the room.  WHITE looked to Patricia Proctor to see if she would do anything to try and deescalate the situation caused by Dylan Michael, but Patricia Proctor did not do anything.  As Dylan Michael continued yelling and being aggressive, WHITE simply walked out of the room to go immediately speak with his manager, Ahren Swan.

155.     After the incident with Dylan Michael, WHITE told Ahren Swan what happened. In response thereto, Ahren Swan told WHITE that HY-VEE management should have sent Dylan Michael home earlier in the morning, because at 6:00 AM, Dylan Michael was pacing around the store acting aggressively, and telling people he took two 800 mg caffeine pills.  Ahren Swan then reiterated to WHITE that Dylan Michael should have been sent home earlier in the morning instead of being allowed to continue working that day.

156.     While management was slow to respond to the situation when it was just between Dale Manley and Dylan Michael, both White/Caucasian employees, once management heard WHITE was involved, management rushed into action.

157.    After WHITE walked out of meat dept behind service counter with Ahren Swan, HOUSBY then approached WHITE with Darren Zink, and told WHITE to come with them to the office.

158.    In response thereto, WHITE asked Dale Manley to come to the meeting also and act as a witness due to Dale Manley mere minutes before encountering Dylan Michael's aggressive behavior.  In response thereto, Dale Manley agreed to come to the office.

159.    When WHITE, HOUSBY, Darren Zink, and Dale Manley arrived at the office, Dylan Michael was already there with HOEGNER.  At that point, HOUSBY told Darren Zink he could leave.

160.    During this meeting, WHITE asked why Patricia Proctor was not also in the room as she witnessed what happened between Dylan Michael and WHITE, and WHITE asked that Patricia Proctor also be part of the meeting.  However, HOEGNER refused WHITE's request that Patricia Proctor participate in the meeting.

161.    During this meeting, Dylan Michael was sitting right next to WHITE. HOEGNER asked all parties to give their sides of the story.

162.    Dylan Michael accused WHITE of threatening him, while WHITE accused Dylan Michael of threatening WHITE.

163.    At the time, WHITE was confused as to why, if there were allegations that WHITE and Dylan Michael threatened each other, HOEGNER would send the two back to work together. For that matter, WHITE was also confused as to why, if the two got into an altercation, HOEGNER would sit the two down next to each other.

164.    After HOEGNER heard each sides' accounts, HOEGNER then told all parties to get back to work and that he would talk to other witnesses and then get back to the parties later.

165.   In response, WHITE told HOEGNER, "We're all in this room already, why don't you bring these witnesses in the office now?" HOEGNER refused and again reiterated that each party should just get back to work.

166.   Feeling uncomfortable returning back to the the meat department and working so close to Dylan Michael, WHITE asked if he could instead just go home for the day. HOEGNER assented and allowed WHITE to leave early for the day.

166.   On November 14, 2019, WHITE returned back to work and worked his regular shift from 9:00 AM until 1:00 PM without incident.

167.   However, the following day, on November 15, 2020, when WHITE returned to work at 7:00 AM, HOEGNER told WHITE that he needed to WHITE to follow him. HOEGNER took WHITE to the store's club room, instead of the HR office, where HOUSBY was waiting. During this meeting, WHITE was informed he was being terminated for the incident that happened with Dylan Michael on November 13, 2019.

168.   During this meeting, WHITE was given a consultation form and a termination report, not signed and dated by anyone, and which only vaguely indicated that WHITE was being terminated for conduct unbecoming of a HY-VEE employee . *See* Termination Notice, marked as Group Exhibit N, attached hereto and made a part hereof.

169.   During this termination meeting, no video evidence of any altercation between WHITE and Dylan Michael was ever shown to WHITE, despite there being video cameras in the room the two allegedly had their altercation, nor did the consultation form or termination report include any statements from Patricia Proctor or Tiffany Butler, who were the only HY-VEE employees to see the alleged altercation firsthand.

28

170.    After the meeting concluded, WHITE was walked outside where he noticed two (2) Police Officers from the Moline, Illinois Police Department standing outside waiting for him.

171.    After WHITE indicated what happened and that he needed to catch a bus back home, one of the Police Officers gave WHITE a ride from the store back to WHITE's apartment.

172.    WHITE later learned that Dylan Michael and Dale Manley's employment had also been terminated by HY-VEE that day.

173.    After the termination, WHITE called Dale Manley to discuss the situation.  Dale Manley informed WHITE that when Dale Manley was in his own termination meeting, HOEGNER showed Dale Manley video footage of Dale's incident with Dylan Michael, as well as the customer reporting him and Dylan Michael to Blaker Puff, the checkout manager. Furthermore, Dale Manley also told WHITE that no police escorts were called for Dale Manley as he left the Moline #2 Store after being terminated.

174.    Upon information and belief, no police escorts were called for Dylan Michael as he left the Moline #2 Store after being terminated, either.

175.    Subsequently, after being terminated by HY-VEE, WHITE applied for unemployment insurance benefits with the Illinois Department of Employment Security ("IDES").

176.    On December 6, 2019, when reviewing the issue of whether WHITE would be ineligible for unemployment insurance benefits due to being fired for "misconduct," IDES' local office issued the following determination:

> "Was the claimant discharged for misconduct connected with the work? The evidence shows the claimant was discharged from HY-VEE INC because he argued with and approached a co-worker in a threatening manner on 11/13/2019.  Claimant denied any such wrongdoing. Employer failed to provide final information.. [sic] Since the claimant's action, which resulted in his discharge was not deliberate and willful, the claimant is not ineligible for benefits from 11/17/2019 in regards to this issue."

*See* IDES Determination, marked as Exhibit O, attached hereto and made a part hereof.

29

177.    On or about December 18, 2019, HY-VEE appealed the initial decision by IDES'

local office to an Administrative Law Judge ("ALJ").   On January 10, 2020, the ALJ issued a

Decision which affirmed the IDES local office's determination, holding that:

> "It is the employer's burden to prove misconduct by preponderance of relevant,
> material, and competent evidence. While the employer may have had a legitimate
> business reason to discharge the claimant, the claimant's actions did not rise to the
> level of misconduct as defined by the Act. His actions did not constitute a deliberate
> and willful disregard of the employer's interest. The employer discharged the
> claimant for reasons other than misconduct as it is defined in Section 602A of the
> Illinois Unemployment Act. The claimant is eligible for benefits under this issue."

*See* ALJ's Decision, marked as Exhibit P, attached hereto and made a part hereof.

178.    On or about January 22, 2020, the EEOC amended WHITE's Charge of

Discrimination to add retaliatory discharge.  *See* WHITE Amended 2019 EEOC Charge, marked

as Exhibit Q, attached hereto and made a part hereof.

179.    After more than 180 days had passed from the day WHITE filed his EEOC charge

without any kind of outcome from the EEOC, the EEOC was required to issue a Right to Sue Letter

to WHITE upon WHITE'S request.  *See* 29 CFR § 1601.28.

180.    On August 31, 2020, WHITE received his Right to Sue Letter from the EEOC.  *See*

Notice of Right to Sue, marked as Exhibit R, attached hereto and made a part hereof.

181.    Pursuant the Notice of Right to Sue and Title VII, claimants must file their lawsuit

in a federal or state court within 90 days of receipt of the EEOC Notice of Right to Sue.  *See*

Exhibit R; *See* also 42 U.S.C. § 2000(e)-5(f)(1).

182.    WHITE timely filed this Verified Complaint within 90 days receipt of the Notice

of Right to Sue.

## COUNT I
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## DISCRIMINATION ON THE BASIS OF COLOR AND RACE
### *(AGAINST ALL DEFENDANTS)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY for a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 USC § 2000e–2, *et seq*., and in support thereof states and alleges as follows:

1-182.  WHITE restates and realleges paragraphs one (1) through one hundred eighty-two (182) as though fully set forth herein.

183.    WHITE is Black/African American.

184.    WHITE is a covered employee to which Title VII applies.  *See* 42 USC § 2000e(a).

185.    Defendants are covered employers to which Title VII applies.  *See* 42 USC § 2000e(b).

186.    The Defendants unlawfully fail/refuse to hire, discharge, and otherwise discriminate against individuals with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race and skin color.

187.    Further, the Defendants unlawfully limit, segregate, and classify their employees or applicants for employment in ways that deprive or tend to deprive these individuals of employment opportunities or otherwise adversely affect such individuals' status as an employee, because of such individuals' race and skin color.

188.    Further, the Defendants unlawfully discriminate against individuals on the basis of their race and skin color in their employee training programs.

189.    The Defendants use particular employment practices that cause a disparate impact on Black and Brown employees.

190.    The Defendants use a racially motivated decision-making process when analyzing employment matters such as the promotions of their employees.

191.    The elements of the Defendants decision-making process are not capable of separation for analysis.

192.    The Defendants cannot demonstrate that their racially motivated decision-making process in deciding promotions for its employees is job related for the position in question, nor is it consistent with a business necessity.

193.    The allegations made *supra* show, *inter alia*, a pattern of discrimination regarding WHITE's ability to apply for even get an interview for a full-time position in the eleven (11) years he worked for HY-VEE.

194.    In WHITE's personnel file, there are undated hand written notes that are, upon information and belief, from around December 2016, pertaining to the dishwashing incident with Diane Farrell, and upon information and belief, were written by either HOUSBY or HOEGNER during interviews of other employees.  These notes convey a supposed conversation witnessed by a "Tom," in which WHITE was speaking to someone at HY-VEE and apparently went from speaking "Good English to *ghetto slang talk*." (Emphasis added).  *See* Personnel File Note, marked as Exhibit S, attached hereto and made a part hereof.

195.    WHITE worked for HY-VEE Moline #2 Store from 2008-2019, always in part-time roles despite frequently requesting full-time employment.  WHITE applied for at least five (5) full-time jobs in 2016, 2017, 2018, and 2019, but was never given an interview for any opportunity.

196.    In other instances, when full-time (non-temporary) positions were opened within HY-VEE's Moline #2 Store's meat department, the positions were not publicly posted on HY-

VEE's website nor in the store, and WHITE was never considered for the positions, despite his years of experience on the job in the meat department. In such instances, the positions went to White/Caucasian employees.

197.    Furthermore, White/Caucasian employees would routinely get disciplinary writeups from their managers, whereas in WHITE's case, only HOEGNER, in human resources, would draft his writeups.  Furthermore, often, these writeups were not signed or dated, nor accompanied by witness statements or other forms required by HY-VEE company policy.

198.    WHITE suffered from a materially adverse employment decision because of his race and skin color when he was: (i) denied for promotions and coincidentally disciplined around the time of putting in applications for promotions, (ii) demoted, (iii) suspended, and (iv) ultimately terminated by the Defendants.

199.    Similarly situated White/Caucasian employees were treated more favorably at HY-VEE by the Defendants during the relevant time period. In general, if White/Caucasian employees were liked by managers, they would be promoted without applying for the position.

200.    The Defendants stated reason for not promoting WHITE—that he did not have requisite training required—was a pretext for discrimination. Darcy Lindsey, Eddie Cupp, and other White/Caucasian employees were allowed to become full-time managers at HY-VEE's Moline #2 Store without proper training, yet when WHITE tried to apply for just a full-time position in the meat department in September 2018, he was denied on the basis of not having the requisite "training" supposedly required by HY-VEE.

201.    The Defendants stated reason for terminating WHITE—that WHITE behaved in a manner unbecoming of a HY-VEE employee—was a pretext for discrimination, as WHITE was not directly involved in the incident between Dylan Michael and Dale Manley and HY-VEE was

unable to produce evidence that affirmatively showed WHITE acting in an unprofessional or threatening manner towards Dylan Michael on November 13, 2019, allegations which ultimately led to WHITE's termination.

202.   In addition to other factors, such as retaliation, race and color were motivating factors in the Defendants decisions to: (i) deny WHITE for promotions and coincidentally discipline WHITE around the time he putt in applications for promotions, (ii) demote WHITE, (iii) suspend WHITE, and ultimately (iv) terminate WHITE's employment.

203.   The Defendants termination and disqualification of WHITE on the basis of his race and skin color, together with the Defendants' failure to make an individualized assessment to determine whether WHITE was qualified for promotions at HY-VEE, violated Title VII.

204.   As a result of the Defendants' actions, WHITE has suffered and will continue to suffer both economic and non-economic harm, including emotional damages.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him the following relief:

A.   Reinstatement to his previous position, or equivalent position, with same seniority status he would have had but for Defendants' acts/omissions alleged herein;
B.   Back pay in an amount to be determined at trial;
C.   In the event reinstatement is not granted, front pay;
D.   All available employment benefits;
E.   Compensatory and consequential damages, including for emotional distress;
F.   Punitive damages;
G.   Pre-judgment and post-judgment interest at the highest lawful rate;
H.   Attorneys' fees and costs of this action;
I.   Expert witness costs; and
J.   Any such further relief as this Honorable Court finds reasonable.

## COUNT II
## <u>VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>
## <u>RETALIATION</u>
### *(AGAINST ALL DEFENDANTS)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, for a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 USC § 2000e–3(a), *et seq*., and in support thereof states and alleges as follows:

1-204.   WHITE restates and realleges paragraphs one (1) through two hundred four (204) as though fully set forth herein.

205.    WHITE is a covered employee to which Title VII applies.  *See* 42 USC § 2000e(a).

206.    Defendants are covered employers to which Title VII applies.  *See* 42 USC § 2000e(b).

207.    Title VII's anti-retaliation provision forbids employer actions that "discriminate against" an employee (or job applicant) because he has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing" under Title VII.  *See* 42 USC §2000e-3(a).

208.    WHITE filed complaints with the EEOC in February 2017 and October 2019, and with the RIHRC in October 2017.

209.    WHITE suffered from a materially adverse employment decision because of his complaints to the EEOC and the RIHRC when he was: (i) denied for promotions and coincidentally disciplined around the time of putting in applications for promotions, (ii) demoted and transferred to less prestigious or desirable work or work locations, (iii) suspended, and (iv) ultimately terminated by the Defendants.

210.    Further, as a result of his complaints to the EEOC and the RIHRC, WHITE encountered many of the following actions from the Defendants: (i) work-related threats, warnings, or reprimands; (ii) negative or lowered evaluations; (iii) threats of reassignment; and (iv) scrutinization of work or attendance more closely than that of other employees, without justification.

211.    As a result, the Defendants violated Title VII.

212.    As a result of the Defendants' actions, WHITE has suffered and will continue to suffer both economic and non-economic harm, including emotional damages.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him the following relief:

A.    Reinstatement to his previous position, or equivalent position, with same seniority status he would have had but for Defendants' acts/omissions alleged herein;
B.    Back pay in an amount to be determined at trial;
C.    In the event reinstatement is not granted, front pay;
D.    All available employment benefits;
E.    Compensatory and consequential damages, including for emotional distress;
F.    Punitive damages;
G.    Pre-judgment and post-judgment interest at the highest lawful rate;
H.    Attorneys' fees and costs of this action;
I.    Expert witness costs; and
J.    Any such further relief as this Honorable Court finds reasonable.

## COUNT III
## VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT
### *(AGAINST ALL DEFENDANTS)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, for a Violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 623(d), and in support thereof states and alleges as follows:

1-212.  WHITE restates and realleges paragraphs one (1) through two hundred twelve (212) as though fully set forth herein.

213.    The ADEA applied to WHITE'S employment with HY-VEE at all times relevant herein.

214.    WHITE was over 40 years of age at the time he was terminated by HY-VEE.

215.    Thus, WHITE was a protected class under the ADEA.

216.    WHITE was qualified for his position as part-time meat stock clerk at the time he was terminated by HY-VEE.

217.    WHITE was treated less favorably than others not in the protected class.

218.    WHITE suffered from a materially adverse employment decision because of his complaints to the EEOC and the RIHRC when he was: (i) denied for promotions and coincidentally disciplined around the time of putting in applications for promotions, (ii) demoted and transferred to less prestigious or desirable work or work locations, (iii) suspended, and (iv) ultimately terminated by the Defendants.

219.    A causal connection exists between the protected activity and the adverse action, because HY-VEE brought someone else into the meat department to replace WHITE right before it terminated WHITE; and the person HY-VEE brought in to replace WHITE, upon information and belief, was younger than WHITE.

220.    In addition to other factors, such as retaliation, age was a motivating factor in HY-VEE'S termination of WHITE.

221.    As a result of the Defendants' actions, WHITE has suffered and will continue to suffer both economic and non-economic harm, including emotional damages.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him the following relief:

A.    Reinstatement to his previous position, or equivalent position, with same seniority status he would have had but for Defendants' acts/omissions alleged herein;
B.    Back pay in an amount to be determined at trial;
C.    In the event reinstatement is not granted, front pay;
D.    All available employment benefits;
E.    Compensatory and consequential damages, including for emotional distress;
F.    Punitive damages;
G.    Pre-judgment and post-judgment interest at the highest lawful rate;
H.    Attorneys' fees and costs of this action;
I.    Expert witness costs; and
J.    Any such further relief as this Honorable Court finds reasonable.

## COUNT IV
## COMMON LAW RETALIATORY DISCHARGE
### *(AGAINST ALL DEFENDANTS)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, for common law Retaliatory Discharge, and in support thereof states and alleges as follows:

1-221.  WHITE restates and realleges paragraphs one (1) through two hundred twenty-one (221) as though fully set forth herein.

222.    Both Illinois and the United States of America have clearly mandated public policies in favor of employees reporting their employers for discriminating against their employees on the basis of race, skin color, age, and/or retaliating against their employers for participating in a government investigation, proceeding, or hearing related to discrimination, which at all times herein apply to HY-VEE and HY-VEE'S Illinois Stores.

223.     WHITE filed a complaint with the EEOC on October 29, 2019 related to discrimination and retaliation on the basis of race, skin color, and age.

224.     WHITE was terminated by HY-VEE on November 15, 2019.

225.     HY-VEE discharged WHITE in retaliation for activities in support of the public policies in favor of employees reporting their employers for discriminating against their employees on the basis of race, skin color, age, and/or for exercising his rights under Title VII and the ADEA.

226.     HY-VEE'S act of discharging WHITE in retaliation for his activities violates the clearly mandated public policies in favor of employees reporting their employers for discriminating against their employees on the basis of race, skin color, age, and/or for exercising his rights under Title VII and the ADEA.

227.     As a result of the Defendants' actions, WHITE has suffered and will continue to suffer both economic and non-economic harm, including emotional damages.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him the following relief:

A.     Reinstatement to his previous position, or equivalent position, with same seniority status he would have had but for Defendants' acts/omissions alleged herein;
B.     Back pay in an amount to be determined at trial;
C.     In the event reinstatement is not granted, front pay;
D.     All available employment benefits;
E.     Compensatory and consequential damages, including for emotional distress;
F.     Punitive damages;
G.     Pre-judgment and post-judgment interest at the highest lawful rate;
H.     Attorneys' fees and costs of this action;
I.     Expert witness costs; and
J.     Any such further relief as this Honorable Court finds reasonable.

## COUNT IV
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
### *(AGAINST ALL DEFENDANTS)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, for a violation of the Illinois Whistleblower Act (the "Whistleblower Act"), 740 ILCS 174 *et seq*., and in support thereof states and alleges as follows:

1-227.   WHITE restates and realleges paragraphs one (1) through two hundred twenty-seven (227) as though fully set forth herein.

228.   The Whistleblower Act prohibits an employer from retaliating against an employee for disclosing information to a government or law enforcement agency, or in an administrative hearing, where the employee has reasonable cause to believe that the information discloses a violation of a State of federal law, rule, or regulation.  *See* 740 ILCS 174/15.

229.   HOEGNER was acting within the scope of his express or implied authority on behalf of the HY-VEE when committing the acts described herein and is therefore an "employer" as defined by the Whistleblower Act.  *See* 740 ILCS 174/5.

230.   WELTER was acting within the scope of his express or implied authority on behalf of the HY-VEE when committing the acts described herein and is therefore an "employer" as defined by the Whistleblower Act.  *See* 740 ILCS 174/5.

231.   HOUSBY was acting within the scope of his express or implied authority on behalf of the HY-VEE when committing the acts described herein and is therefore an "employer" as defined by the Whistleblower Act.  *See* 740 ILCS 174/5.

232.   As a corporation, HY-VEE is an "employer" as defined by the Whistleblower Act. *See* 740 ILCS 174/5.

233.    WHITE is an "employee" under the Whistleblower Act. *See* 740 ILCS 174/5.

234.    The Defendants violated the Whistleblower Act by retaliating against WHITE in numerous ways after WHITE disclosed information about HY-VEE'S practices to the EEOC and the RIHRC, which WHITE had reasonable cause to believe disclosed a violation of, *inter alia*, Title VII and the ADEA, which at all times herein applied to HY-VEE and its Illinois Stores.

235.    The retaliation against WHITE included, but was not limited to: (i) denying WHITE the opportunity for promotions and coincidentally disciplining him around the time he put in applications for promotions, (ii) demoting WHITE, (iii) suspending WHITE, and (iv) ultimately terminating WHITE's employment on November 15, 2019.

236.    As a result of the Defendants' actions, WHITE has suffered and will continue to suffer both economic and non-economic harm, including emotional damages.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him the following relief:

A.    Reinstatement to his previous position, or equivalent position, with same seniority status he would have had but for Defendants' acts/omissions alleged herein;
B.    Back pay in an amount to be determined at trial;
C.    In the event reinstatement is not granted, front pay;
D.    All available employment benefits;
E.    Compensatory and consequential damages, including for emotional distress;
F.    Punitive damages;
G.    Pre-judgment and post-judgment interest at the highest lawful rate;
H.    Attorneys' fees and costs of this action;
I.    Expert witness costs; and
J.    Any such further relief as this Honorable Court finds reasonable.

**COUNT V**
**COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*(AGAINST ALL DEFENDANTS)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, for an intentional infliction of emotional distress and in support thereof states and alleges as follows:

1-236.  WHITE restates and realleges paragraphs one (1) through two hundred thirty-six (236) as though fully set forth herein.

237.    The Defendants' conduct in: (i) intentionally disciplining WHITE when WHITE applied for a promotion, thus disqualifying WHITE for said promotion; (ii) discriminating against WHITE on the basis of his race, skin color, and age; and (iii) discharging WHITE in retaliation for activities in support of the public policies in favor of employees reporting their employers for discriminating against their employees on the basis of race, skin color, age, and/or for exercising his rights under Title VII and the ADEA, are truly extreme and outrageous and go beyond all possible bounds of decency.

238.    The Defendants either intended that their conduct would inflict severe emotional distress or knew that there was at least a high probability that their conduct would cause severe emotional distress when they habitually discriminated WHITE over a period of eleven (11) years and ultimately terminated his employment two (2) weeks after he filed a complaint with the EEOC.

239.    The Defendants' conduct did in fact cause severe emotional distress to WHITE.

240.     A defendant in a tort case "must take his plaintiff as he finds [him], even if [he] is more susceptible to injury than the average person." *Zurba v. United States,* 247 F. Supp. 2d 951,

962 (N.D. Ill. 2001); *Reed v. Union Pacific Railroad Co.,* 185 F.3d 712, 717 (7th Cir. 1999);

*Colonial Inn Motor Lodge, Inc. v. Gay,* 288 Ill. App. 3d 32, 45, 680 N.E.2d 407, 416 (1997).

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against Defendants, HY-VEE, INC.; TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him the following relief:

A. Reinstatement to his previous position, or equivalent position, with same seniority status he would have had but for Defendants' acts/omissions alleged herein;
B. Back pay in an amount to be determined at trial;
C. In the event reinstatement is not granted, front pay;
D. All available employment benefits;
E. Compensatory and consequential damages, including for emotional distress;
F. Punitive damages;
G. Pre-judgment and post-judgment interest at the highest lawful rate;
H. Attorneys' fees and costs of this action;
I. Expert witness costs; and
J. Any such further relief as this Honorable Court finds reasonable.

## COUNT VII
## VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT
## HY-VEE

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendant, HY-VEE, INC., for a violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq*., (the "IWPCA"), and in support thereof states and alleges as follows:

1-240. WHITE restates and realleges paragraphs one (1) through two hundred forty (240) as though fully set forth herein.

241. Pursuant to the IWPCA, HY-VEE was required to pay WHITE'S final compensation in full, at the time of separation or not later than the next regularly scheduled payday. *See* 820 ILCS 115/5.

242.    Notwithstanding the requirements of the IWPCA, HY-VEE failed to pay WHITE his full final compensation, including but not limited to all paid time off, extended sick leave, and vacation time that WHITE had accrued and earned while employed at HY-VEE.

243.    HY-VEE'S failure to pay WHITE his full final compensation violates the IWPCA.

244.    Pursuant to the IWPCA, WHITE is entitled to bring a civil action and obtain, *inter alia*, compensation, statutory damages, and attorney's fees for HY-VEE'S failure to timely pay his full final compensation.  *See* 820 ILCS 115/14.

245.    As a direct and proximate result of HY-VEE'S wrongful actions, WHITE has suffered damages in an amount to be more specifically proved at trial; damages he is entitled to receive.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against the Defendant, HY-VEE, INC., and that this Honorable Court award him in an amount to be more specifically proved at trial, representing final compensation to which WHITE is entitled, plus statutory damages as set forth in the IWPCA; plus attorney's fees, costs, and expenses incurred in bringing this litigation; and for any such further relief as this Honorable Court finds reasonable.

## COUNT VIII
## VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### *(AGAINST HOEGNER; WELTER; HOUSBY)*

NOW COMES the Plaintiff, MARK L. WHITE, by and through his attorneys, for his Complaint against the Defendants, TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, for a violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq*., (the "IWPCA"), and in support thereof states and alleges as follows:

1-245.  WHITE restates and realleges paragraphs one (1) through two hundred forty-five (245) as though fully set forth herein.

246.    Pursuant to the IWPCA, HY-VEE'S officers who knowingly permitted HY-VEE to violate the IWPCA are deemed employers of employees of the corporation.  *See* 820 ILCS 115/13.

247.    HOEGNER, WELTER, and HOUSBY; knowingly permitted HY-VEE to violate the IWPCA by, *inter alia*, refusing to pay WHITE his full final compensation.

248.    HOEGNER, WELTER, and HOUSBY; are personally liable to WHITE for the failure to pay WHITE'S full final compensation.

249.    As a direct and proximate result of the wrongful actions of HOEGNER, WELTER, and HOUSBY, WHITE has suffered damages in an amount more specifically proved at trial; damages he is entitled to receive.

WHEREFORE, the Plaintiff, MARK L. WHITE, respectfully requests that judgment be entered against the Defendants, TROY HOEGNER; JERAD WELTER; and TIM HOUSBY, and that this Honorable Court award him in an amount to be more specifically proved at trial, representing final compensation to which WHITE is entitled, plus statutory damages as set forth in the IWPCA; plus attorney's fees, costs, and expenses incurred in bringing this litigation; and for any such further relief as this Honorable Court finds reasonable.

## **JURY DEMAND**

MARK L. WHITE requests a trial by jury on all counts of this Verified Complaint.


Respectfully submitted,
MARK L. WHITE

By:      /s/ Matthew R. Custardo
                   One of his Attorneys


CUSTARDO LAW, LLC
Matthew R. Custardo (ARDC #: 06329579)
300 S Carlton Avenue, Suite 210
Wheaton, IL  60187
Tel.: 630-557-1451 | Fax: 630-557-8050
matt@custardolaw.com

## VERIFICATION

I, MARK L. WHITE, am a Plaintiff in this action. I have read the foregoing Verified Complaint and am familiar with its contents. I declare under penalty of perjury under the laws of the United States that all of the factual statements contained in the foregoing Verified Complaint are true and accurate to the best of my belief and is based upon personal knowledge, except where expressly indicated otherwise.

*Mark L. White*
Mark L. White (Nov 25, 2020 19:43 CST)
MARK L. WHITE

CUSTARDO LAW, LLC
Matthew R. Custardo (ARDC #: 06329579)
300 S Carlton Avenue, Suite 210
Wheaton, IL  60187
Tel.: 630-557-1451 | Fax: 630-557-8050
matt@custardolaw.com